Oliver BAKKEN and Geneva Bakken, Appellants (Defendants),

v.

Donald G. PRICE and G. Roger Sedam, d/b/a the One Eighty-five Development Company, a Joint Venture, Appellees (Plaintiffs).

Donald G. PRICE and G. Roger Sedam, d/b/a the One Eighty-five Development Company, a Joint Venture, Appellants (Plaintiffs),

v.

Oliver BAKKEN and Geneva Bakken, Appellees (Defendants).

Nos. 5201, 5202.

Supreme Court of Wyoming.

July 11, 1980.

John O. Housel, Housel & Housel, Cody, for appellants in No. 5201 and appellees in No. 5202.

L. B. Cozzens, Simpson, Kepler & Cozzens, Cody, for appellees in No. 5201 and appellants in No. 5202.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROSE, Justice.

These consolidated appeals have as their origin an action brought by Donald G. Price and G. Roger Sedam, buyers, against Oliver and Geneva Bakken, sellers, to rescind a contract of sale and recover the down payment for the purchase of real property in Park County. Sellers counterclaimed seeking either to recover on a promissory note for the balance of the purchase price and to foreclose a mortgage given as security therefor, or to regain title to the property and retain the down payment as liquidated damages. Both parties moved for summary judgment and, consistent with the prayer of the purchasers, the summary judgment rescinded the contract and awarded the buyers the $6,000.00 paid on the purchase price, with interest from and after July 1, 1977,

the date of delivery of the deed, note and mortgage and payment of $5,000.00 of the aforesaid purchase-price money. Allowance of costs, including attorney fees incurred in the litigation, was denied. Sellers appeal from the money judgment against them and the refusal of the court to enforce the note and mortgage. Buyers cross-appeal from the denial of the costs.

We will reverse and remand.

## THE ISSUE

The main question raised by these appeals has to do with the rights of the buyers, after they had received a warranty deed to the property and had delivered their note and mortgage to the sellers, to rescind the contract because a title insurance policy, although bargained for, could not be issued showing title in them since the recording of the deed was refused by the county clerk.

## FACTS

With the execution of a document entitled "Purchase Agreement Acceptance and Receipt" (sometimes referred to herein as the contract for sale), the purchasers agreed to buy and the sellers agreed to sell land in Park County, Wyoming, for $66,000.00. $1,000.00 was to be and was paid upon the execution of the agreement on May 31, 1977, and $5,000.00 was paid on July 1, 1977. A note and mortgage served as evidence of and security for the balance.

On this last-mentioned day, the promissory note and the mortgage were delivered to the sellers, and a warranty deed showing sellers as grantors and purchasers as grantees was delivered to the buyers. Delivery of these three instruments was made after the time called for in the contract for issuing a title policy showing merchantable fee title in the *sellers* and the issuing of a title insurance commitment to provide a policy of title insurance insuring title in the *buyers*. In June of 1978, buyers attempted but were unable to record the warranty deed.

On August 23, 1978, the Park County Clerk informed buyers that the warranty deed could not be recorded until the land was subdivided and a plat recorded according to the requirements of the Park County Assessor. The reason for this refusal was that the land "had already been subdivided the maximum number of times." (Affidavit of County Clerk Phyllis Smith Saggoner, attached to plaintiff's motion for summary judgment.)

*Purchase Agreement Acceptance and Receipt*

Relevant provisions of the Purchase Agreement Acceptance and Receipt, i. e., the contract for sale, entered into by the parties hereto on the 31st day of May, 1977, are the following:

1. Paragraph 8 of the aforesaid agreement provides in relevant part:

"Promptly after SELLER'S acceptance of this offer, SELLER shall, at SELLER'S expense, . . . furnish BUYER a Title Insurance Policy in the full amount of the purchase price of the real property in a Title Insurance Company authorized to do business in the State of Wyoming, reflecting *merchantable fee title in SELLER,* . . . subject only to . . . (e) zoning or building laws or ordinances if any. . . ." (Emphasis supplied.)

2. Paragraph 10 of the agreement provides:

"If a Title Insurance Policy is furnished by the SELLER, the SELLER shall also within 15 days after acceptance of this offer, furnish the BUYER with a written Commitment from the Title Insurance Company evidencing its willingness to issue the required Title Insurance Policy *upon completion of sale,* . . ." (Emphasis supplied.)

3. The parties further agreed in Paragraph 11:

"SELLER agrees to execute and deliver all necessary instruments and transfer title by General Warranty Deed."

*The Title Insurance Commitment*

The Purchase Agreement Acceptance and Receipt having been entered into on the 31st of May, 1977, the record shows that a title insurance policy commitment, dated May 23, 1977, had been previously ordered. This commitment (delivered to buyers shortly after they delivered their note and mortgage to sellers on July 1, 1977, according to Sedam's deposition), obligated the title insurance company to insure the property in fee title in Donald G. Price and G. Roger Sedam under certain conditions. The commitment was predicated upon these essential propositions:

The commitment's Paragraph 2 provided:

"The estate or interest in the land described or referred to in this commitment and covered herein is fee simple."

Paragraph 3 said:

"Title to said estate or interest in said land is at the effective date hereof vested in Oliver Bakken and Geneva Bakken."

One of the "requirements" defined by the commitment as necessary to create a fee simple estate in the property in the proposed insureds, Donald G. Price and G. Roger Sedam, was the following:

"Instruments necessary to create the estate or interest to the insured must be properly executed, delivered *and duly filed for record.*" (Emphasis supplied.)

In plain English—these various provisions contained in the contract of sale and the title insurance commitment impose the following rights, duties and obligations upon the parties:

*The Bakkens' Obligations:*

When the Bakkens signed the Purchase Agreement Acceptance and Receipt on May 31, 1977 (thereby accepting Price's and Sedam's offer to buy the land for $66,000.00), it became their obligation to:

1. Deliver to Price and Sedam a warranty deed showing Bakkens as grantors and Price and Sedam as grantees. This was done on July 1, 1977.

2. Provide buyers, Price and Sedam, with a title insurance policy showing "merchantable fee title" in Bakkens, the sellers, subject to ". . . zoning and building laws, if any. . . ." This obligation was to be discharged "promptly after sellers' acceptance of this offer." (Contract language). The "acceptance" date was May 31, 1977. The *sellers did not* furnish the buyers such a policy by May 31, 1977, or at any subsequent time.

3. Since title insurance was utilized (as opposed to an abstract), the Bakkens were *also* obliged, in addition to their duty to furnish buyers a policy showing "merchantable fee title in the sellers," to furnish Price and Sedam with a commitment from the title company within 15 days *after* signing the Purchase Agreement Acceptance and Receipt.[1] This commitment was to provide that the title insurance company would agree to issue a title policy which would insure title in fee simple in Price and Sedam when the sale was completed.[2] One of the commitment provisions was that the instrument necessary to create a fee simple estate in the buyers (a warranty deed) would be *filed of record.*

The commitment, which predated the contract for sale, but which was delivered July 1, 1977, was issued by the title company, but its provisions with respect to issuing a policy showing title in Price and Sedam was incapable of fulfillment because of the non-recordability of the deed. That is to say—when the deed was presented, the county clerk refused to record it. Therefore, the contract provisions requiring Bakkens to furnish a title insurance policy showing "merchantable title in SELLER,"

---

1. As has been noted—the only commitment furnished was a commitment dated May 23, 1977, wherein the title company agreed to issue a title insurance policy showing fee title in the *buyers*, providing the warranty deed showing Bakkens as grantors and Price and Sedam as grantees was "duly filed for record."

2. We are comfortable with our conclusion that the commitment calling for a title insurance policy showing title in Price and Sedam because "upon completion of the sale," (Paragraph 10 language, supra), it is in the buyers that title would reside.

as well as the provision requiring the Bakkens to furnish a commitment evidencing the title insurance company's willingness to issue its policy showing title in the buyers, Price and Sedam, was incapable of fulfillment by the Bakkens because the deed could not be recorded.

*Price's and Sedam's Obligations:*

It was—under the agreement to buy and sell—the purchasers', Price's and Sedam's, obligation to deliver the note and mortgage and to thereafter make the payments. The note and mortgage were delivered on July 1, 1977, but the payments provided for ·therein were never made because Price and Sedam undertook a rescission of the contract when they found the warranty deed could not be recorded.

In essence, then, the sellers are forced into the position of contending that the executory contract of sale did not obligate them to deliver a *recordable deed*—only a warranty deed warranting the title in the grantors and, as between grantors and grantees, conveying fee title to the grantees. This obligation—say the sellers—was fulfilled.

The purchasers—on the other hand—urge that it was the sellers' obligation to furnish—not just a warranty deed—but also a *title insurance policy* showing *merchantable title in the sellers*, subject only to contract exceptions. Purchasers also contend that the sellers were to furnish a title insurance commitment to later issue a policy showing fee title in the *buyers*. These obligations—contend the buyers—were not discharged

by the sellers and therefore the contract should be rescinded and their moneys returned. The buyers were successful in urging this position before the trial court.

Based upon the facts recited above, this much can be concluded:

Had the sellers complied with their contractual obligation to furnish a title insurance policy showing "merchantable fee title" in themselves, subject to the contract of sale exceptions (contract Paragraph 8 requirement), the second obligation, which was to furnish a title insurance company's commitment evidencing a willingness to issue a title insurance policy showing fee title in the *buyers* would have been dischargeable without problem or incident.

The reason is that a title insurance policy showing "merchantable fee title in SELLER" carries with it the certification that the seller's deed is recordable—otherwise it could not be regarded as a "merchantable fee title." It was the unrecordability of the sellers' deed that prevented the title insurance company from issuing a title insurance policy showing merchantable fee title in the *sellers* and its ultimate commitment to issue an insurance policy showing title in the *buyers*.

We conclude, as did the trial court, that the breach which precluded the fulfillment of the executory contract for the sale of the property in question here, was the Bakkens' failure to provide the purchasers—Price and Sedam—with the policy showing "merchantable fee title in *SELLER*." (Emphasis supplied.)[3]

---

3. The first two paragraphs of the trial judge's decision letter read as follows:

"Gentlemen:

"A provision in a contract for the sale of real estate requiring the seller to furnish title insurance fixes the rights of the parties to the contract. The seller, as a condition to requiring the buyer to accept the title and perform under the contract must tender a title meeting this requirement. 77 Am.Jur.2d Vendor & Purchaser § 130 (1975); 7 Williston on Contracts, Third Edition § 923 (1970). The terms of this requirement are to be measured by the contract as a whole, but generally where the seller fails to provide such title insurance, the buyer need not accept the title.

At the [sic] point he may rescind the contract and recover the amount paid on the contract. 75 A.L.R. 1253.

"In the present case, the seller in the contract of sale agreed to '. . . furnish the BUYER with a written commitment from the Title Insurance Company evidencing its willingness to issue the required Title Insurance Policy upon completion of sale. . . .' The title insurance policy was never issued because it was contingent upon the recording of a warranty deed from the defendants to the plaintiffs. Because of subdivision requirements the title insurance policy was never issued. Therefore, the defendants failed to comply with this contract provision. Because of this failure, the plaintiffs are not

An unrecordable warranty deed *is not* what the bargain calls for. A title insurance commitment showing title in the purchasers, predicated upon "merchantable fee title in SELLER," is what the contract calls for and the sellers did not discharge this obligation because their warranty deed was not recordable.

## THE LAW

### The Sellers Breached the Contract

In a recent case before the appellate division of the Superior Court of New Jersey, the contract was to deliver a marketable title and "one that will be insurable by a recognized title company." The court held the parties to their agreement. *Mackenzie v. McLean*, 20 N.J.Super. 517, 90 A.2d 515, 516 (1952). In *Laba v. Carey*, 29 N.Y.2d 302, 327 N.Y.S.2d 613, 617, 277 N.E.2d 641, 644 (1971), the court of appeals recognized that when a seller contracts to deliver a title approved by a responsible title company, "he breaches the contract when the title company refuses to insure title unconditionally and without exception."

In *Korb v. Spray Beach Hotel Co.*, 24 N.J.Super. 151, 93 A.2d 578, 580, 581 (1952), the appellate division of the superior court adopted in part the decision of the trial division, in which it had been said:

" 'Contracts whose performance is conditioned on the approval of third parties are not unusual. 57 A.L.R. 1322 recognizes the principle that a contract may properly contain a provision in effect obligating the vendor to convey such a title as a designated title insurance company will approve and insure.

\* \* \* \* \* \*

" 'Since the vendor breached the covenant pertaining to the delivery of such goods and merchantable title as would be insured by the designated title company, it was the right of the vendee to promptly repudiate the contract. This he did, thereby entitling him to the return of his

compelled to accept an uninsured title, but, by the great weight of authority, they are

deposit, together with interest from the date of closing as well as the title search fees.' "

As was said in *Royce v. Rymkevitch*, 29 A.D. 1029, 289 N.Y.S.2d 598, 602 (S.C.A.C. 1968), where the agreement was that title insurance would be delivered by the seller to buyer:

". . . If a vendor of realty agrees to furnish title insurance to the purchaser, he must do so; otherwise the purchaser need not take title . . . ."

To the same effect is *Drake v. Gaffney*, 183 A.D. 577, 171 N.Y.S. 131, 132 (1918), affirmed without opinion, 228 N.Y. 596, 127 N.E. 911 (1920).

### Executory vs. Executed Contract

Had the parties relied upon their rights under the contract *before delivery of the instruments called for by the agreement*, we would have been able to agree with the trial court's conclusion that the purchasers had the right to rescind the executory agreement and recover their down payment because of the breach committed by the sellers.

Encyclopedia authority for this proposition is expressed in 92 C.J.S. Vendor & Purchaser § 552(2)(a), pp. 556–560, where the text says:

"Where the purchaser under an executory contract for the sale and purchase of land rightfully rescinds the contract for defects in the vendor's title, or a want of good title in the vendor, as discussed supra § 161, he may maintain an action for the recovery of payments made by him on the purchase price, and it has been held that he may recover such payments, regardless of whether or not he knew of the defect before entering into the contract. *Thus, the purchaser may maintain such an action where the title is subject to a reservation or restrictions, such as building restrictions against the property, or restrictions as to the use to which the premises may be put; or where the ven-*

entitled to rescind the contract and recover the amount paid under the contract."

dor is unable to convey a title such as will be guaranteed or insured by a title company, as required by the contract, . .

"In general, if at the time fixed for performance the vendor is unable to furnish a good title, the purchaser may maintain an action to recover amounts paid on the purchase price. . . ." (Emphasis supplied.)

In the same vein, we have said in *Mader v. James*, Wyo., 546 P.2d 190, 193 (1976):

". . . A written contract for the sale [of real property], while still executory, may be rescinded by . . . acts and conduct constituting abandonment of the written bargain. . . ."

In the case at hand, the parties, indeed, undertook to act and conduct themselves in a way which was inconsistent with the terms of the buy-and-sell agreement. They clearly did not continue to rely upon their rights under the contract. After the sellers had failed to discharge their duty to furnish a title insurance policy showing merchantable title in them, and when the sellers were unable to bring about the issuing of a title insurance policy showing title in the buyers, once the deed had been recorded, the buyers, instead of relying upon the breach and urging rescission, accepted the delivery of the warranty deed, and, in exchange, delivered their note and mortgage to the sellers.

What is the effect of the making and delivery of the deed upon the purchasers' right to rescind?

▇ Once the deed was executed and delivered, the executory contract became executed. In 8A Thompson on Real Property, 1963 Replacement, § 4441, at p. 250, the following language appears:

"An executory contract of sale becomes executed when the deed is itself completely executed and title passes. . ."

In the same paragraph, the writer says:

". . . A contract to sell is an executory contract until a conveyance is made." (Citing *Bauer v. Monroe*, 117 Mont. 306, 158 P.2d 485 (1945).[4]

Since a contract is no longer executory but is executed upon making and delivering the deed, it is the further appropriate rule of law that, thereafter, the provisions of the contract are merged into the deed and it is the deed that controls the rights and obligations of the parties.

In 8A Thompson on Real Property, supra, § 4458, p. 331, this language appears:

"In accordance with contract law generally, all provisions in the contract are merged into the deed when executed and delivered except those covenants which are deemed to be collateral to the sale. Thus, the deed regulates the rights and liabilities of the parties. . . ." (Footnotes omitted.)

*Purchasers' Relief* :

In *Fellows v. Evans*, 33 Or. 30, 53 P. 491, 492 (1898), the court spoke of the executed contract of sale of real estate where there was a failure of title:

". . . [T]he law is well settled that, in the absence of fraud, an executed sale of real estate will not be rescinded for that cause, but in such case the purchaser must look for protection to the covenants of the deed. . . ."

It is said in 91 C.J.S. Vendor & Purchaser, § 161(b), Executed Contracts, p. 1122:

"Where the purchaser enters into possession [5] under a contract executed by a

---

4. *Bauer*, supra, quotes an earlier edition of Thompson—namely, 8 Thompson on Real Property, Perm.Ed. sec. 4564, p. 489, for these propositions:

"'A contract to sell land, being preliminary to the sale and not the sale itself and also subject to recission by agreement between the parties, is an executory contract. A contract for the sale of land is wholly executory until the conveyance is made, * * *.'"

5. In this case, the buyers have represented that they never were in possession of the purchased tract. However, as was said in *Baehr v. Penn-O-Tex Oil Corporation*, 258 Minn. 533, 104 N.W.2d 661, 664 (1960):

"'Possession' is a chameleon-like term which takes its meaning from its context both in common speech and in legal terminology. The term is used interchangeably to denote the legal concepts of 'actual posses-

conveyance with covenants of warranty, *he is not entitled to rescind for failure of title* in the vendor or for defect in the title, at least in the absence of other grounds for rescission, such as fraud, or insolvency of the vendor, especially where he knew of the defects before the conveyance, or delayed taking action until after the vendor had perfected his title, or has refused the vendor's offer to correct any mistake he has made in the conveyance. *His remedy is in an action at law on the covenants. . . ."* (Emphasis supplied.)

In *Decker v. Schulze*, 11 Wash. 47, 39 P. 261, 263 (1895), the court held that, after a conveyance, a purchaser has no remedy except

" '. . . upon the convenants he has obtained, although evicted for want of title; and, however fatal the defect of title may be, if there is no fraudulent concealment on the part of the seller, the purchaser's only remedy is under the covenants,' 1 Sugd. Vend. p. 383; . . ."

See, also, Annotation—Vendee in Possession—Rescission, Breach of covenant as ground for affirmative relief, 50 A.L.R. 180, 185, together with citations, where it is said:

"It is a general rule that, in the absence of fraud, insolvency, or nonresidence of the vendor, a vendee, in the peaceable possession [See, fn. 5, supra] of

land under and by virtue of a valid conveyance containing covenants of title and general warranty, is not entitled to a rescission of the contract, or a return of the purchase money or any part thereof, on the ground of a defect in the title of his vendor, although the vendee had no knowledge thereof at the time he accepted the conveyance and paid the purchase price."

An annotation in 65 A.L.R. 1142 upon the same subject is to the same effect.

As the rule is stated in 20 Am.Jur.2d, Covenants, Conditions, and Restrictions § 111, p. 668,

"[a] court of equity will not ordinarily interfere to grant relief merely because of a breach of a covenant of title in a conveyance of land, and generally, in the absence of fraud or some other facts rendering the remedy at law inadequate, a purchaser who accepts a conveyance with covenants of title is required to enforce claims based upon breaches of those covenants by an action at law for damages, upon the familiar principle that the jurisdiction of equity cannot be invoked by one who has adequate remedy at law for redress of his wrongs. . . ."

In *Jolley v. Idaho Securities, Inc.*, 99 Idaho 373, 414 P.2d 879 (1966), rescission of the entire deal was specifically sought and denied, the court saying that "[t]he record fails to sustain the contention that appel-

---

sion' and 'constructive possession.' With reference to land, the legal concept of 'actual possession' is substantially the same as 'actual occupancy,' which means physical presence upon and control of the premises. 'Constructive possession' is more difficult to define. It is usually said to mean the legal right to possession which follows from title without actual possession."

In *Kouri v. Burnett*, Okl., 415 P.2d 963, 968 (1966), the Oklahoma court quotes from *Cox v. Sarkeys*, Okl., 304 P.2d 979, 983 (1956), which in turn quoted from the official syllabus in *Cox v. Kelley*, Okl., 295 P.2d 1061, 1062 (1956):

" 'What constitutes "possession" of land is a mixed question of law and fact; "actual possession" consisting of the exercise of acts of dominion over it, in making the ordinary use of it and taking the ordinary profits it is capable of yielding in its present state.' "

In the matter before us, there was no showing that buyers were in any way prevented from doing what they wanted with the land, nor has there been any showing as to acts of possession. In *Reuter v. Lawe*, 86 Wis. 106, 56 N.W. 472, 473 (1893), the action was one to rescind a warranty deed. The plaintiff had taken no actual possession of the land, "though there appears to have been nothing to prevent his taking possession if he chose." The court continued:

"The element of fraud being entirely eliminated from the transaction, there can be no rescission, even though the title failed, because the *contract had been executed by* delivery of the deed and payment of the purchase money, *and there was nothing to prevent the plaintiff from taking possession . .* Under such circumstances, the plaintiff's remedy is by action on the covenants of the deed." (Emphasis supplied.)

lants were entitled to rescission of the exchange of deeds." Petition for rehearing was then denied with this statement:

"The trial court by its findings of fact, conclusions of law and decree, in addition to denying appellants' claim for rescission of the contract on the asserted grounds of misrepresentation, also found and concluded that the agreement was executed by acceptance and recording of the deed. Under such circumstances where the deed had been delivered and the vendee is in possession, in the absence of fraud or misrepresentation, the purchaser is relegated to this action for damages for defects in the vendor's title. . . ."

414 P.2d at 891.

We are aware that the deed in the case at Bar has not been recorded, but this court has held that recording of the deed is not necessary to the transfer of title. As was said in *Whalon v. North Platte Canal & Colonization Co.*, 11 Wyo. 313, 71 P. 995, 999 (1903):

"With hardly an exception, under similar statutes it is held that neither an acknowledgement of a deed nor its recording are essential to pass the legal title as between the parties to the instrument. . . ."

The rule was reiterated in *North American Uranium, Inc. v. Johnston*, 77 Wyo. 332, 316 P.2d 325, 328 (1957).

■ The rights and obligations of the parties having merged in the warranty deed, the purchasers' relief being in damages for breach of warranty rather than rescission, the statutory provisions relating to the covenants of the deed become pertinent.

Section 34–2–103, W.S.1977, provides:

"Every deed in substance in the above form [§ 34–2–102] [6], when otherwise duly executed, shall be deemed and held a conveyance in fee simple, to the grantee, his heirs and assigns, with covenants on the part of the grantor, (a) that at the time of the making and delivery of such deed he was lawfully seized of an indefeasible estate in fee simple in and to the premises therein described, and had good right and power to convey the same; (b) that the same were then free from all incumbrances; and (c) that he warrants to the grantee, his heirs and assigns, the quiet and peaceful possession of such premises, and will defend the title thereto against all persons who may lawfully claim the same. And such covenants shall be obligatory upon the grantor, his heirs and personal representatives, as fully, and with like effect as if written at length in such deed."

According to the present state of the record, we are not, at this time, able to answer the question of whether or not there has been a breach of the warranty deed with its covenants as contemplated by the statute.

The County Clerk, by affidavit, states that she refused to record the warranty deed because it constituted an illegal subdivision of properties owned by the grantors. By virtue of a letter attached to her affidavit as an exhibit, it appears that she relied upon the provisions of Ch. 176, § 18–289.19, S.L. of Wyoming 1975, which are now found in § 18–5–310, W.S.1977, which provides:

"The county clerk of each county shall not accept, file or record in the official records of the county any deed of conveyance or any contract or agreement to convey any land subject to this article until a subdivision permit has been issued by the board."

In her affidavit, the County Clerk also stated that she relied upon advice from the County Assessor with respect to recordability of deeds. The County Assessor, in his

---

**6.** Section 34–2–102, W.S.1977, describes the standard form warranty deed in the following language:

"Warranty Deed.

"A.B., grantor (here insert name or names and place of residence), for and in consideration of (here insert consideration) in hand paid, conveys and warrants to C.D., grantee (here insert grantee's name or names and place of residence) the following described real estate (here insert description) situate in the county of _____, state of Wyoming.

"Dated this ___ day of ___ A.D. ___

"_____ A.B."

affidavit, alludes to § 34–12–102, W.S.1977, setting forth the duty to file a plat with respect to any tract or parcel of land which has been subdivided into three or more parts.[7] That statute reflects that "[t]he duty to file for record a plat, as provided herein . . ., shall attach as a covenant of warranty, in all conveyances of any part or parcel of such subdivisions by the original owners or proprietors, against any and all assessments, costs and damages, paid, lost or incurred by any grantee, or person claiming under him, in consequence of the omission on the part of said owner or proprietors to file such plat."

If there be violations of the warranties in the warranty deed, it is necessary for there to be a factual determination as to which of these statutory provisions, in fact, were invoked or should have been invoked. Arguably, invocation of the latter provision might not lead to a finding of a violation of the statute. Depending upon the actual facts of ownership, the former provision may not have been a valid basis for refusing to record the deed. Depending upon the factual resolutions, however, the district court would find either that there was a breach of the warranties or that there was not. If there were no breach, this finding would amount to a disposition of the case.

 If a breach of the warranties in the deed were found, then rescission is not an available remedy in this instance because it is possible to accomplish the subdivision plat and thereby make the deed recordable. Volume 8A, Thompson on Real Property, § 4487, at page 535, says:

7. The exact wording of this statute is as follows:

"Every original owner or proprietor of any tract or parcel of land, who has heretofore subdivided, or shall hereafter subdivide the same into three (3) or more parts for the purpose of laying out any town or city, or any addition thereto, or any part thereof, or suburban lots, shall cause a plat of such subdivision, with references to known or permanent monuments, to be made, which shall accurately describe all the subdivisions of such tract or parcel of land, numbering the same by progressive numbers, and giving the dimensions, and length and breadth thereof, and the breadth and courses of all the streets and alleys established therein. Descriptions

". . . In the absence of fraud, an executed sale of real estate will not be rescinded for failure of title, but the purchaser's remedy then is an action on the covenants of the deed. . . ."

See, also, *Kimball v. West*, 15 Wall. 377, 82 U.S. 377, 21 L.Ed. 95 (1872); *Refeld v. Woodfolk*, 22 How. 318, 63 U.S. 318, 16 L.Ed. 370 (1859); and *Andrus v. St. Louis Smelting and Refining Company*, 130 U.S. 643, 9 S.Ct. 645, 32 L.Ed. 1054 (1889).

We reverse and remand for further proceedings not inconsistent with the directives of this opinion.

McCLINTOCK, Justice, concurring in part and dissenting in part.

I agree with the majority that the judgment should be reversed and the cause remanded for further proceedings. In two major aspects I disagree with the reasoning upon which the opinion is based and do not want silence to indicate my approval thereof. Moreover, I disagree with the disposition proposed by the majority in that they hold the sole remedy of the purchasers is a claim for damages based on possible breach of covenants in the deed. In my opinion there exists a definite claim for damages for breach of covenant in the agreement which survived the execution of the deed. More importantly, I would not foreclose the development of facts justifying the remedy of rescission.

I cannot agree that the provisions in the purchase agreement concerning the sellers'

of lots or parcels of land in such subdivisions, according to the number and designation thereof, on said plat contained, in conveyances, or for the purposes of taxation, shall be deemed good and valid for all intents and purposes. The duty to file for record a plat, as provided herein [§§ 34–12–101 to 34–12–104, 34–12–106 to 34–12–115], shall attach as a covenant of warranty, in all conveyances of any part or parcel of such subdivisions by the original owners or proprietors, against any and all assessments, costs and damages, paid, lost or incurred by any grantee, or person claiming under him, in consequence of the omission on the part of said owner or proprietors to file such plat."

duty to provide a title insurance policy and a commitment to issue a title insurance policy merged with the deed when it was executed, nor do I believe that damages are the only possible remedy. For these reasons I concur in the reversal but dissent from the disposition of the appeal.

### Covenant to Furnish Title Insurance

My first area of disagreement is with the majority's interpretation of the agreement as requiring that sellers "[p]rovide buyers, Price and Sedam, with a title insurance policy showing 'merchantable fee title in Bakkens'." While I cannot deny that the literal language of the agreement so provides, I do not believe that this language reflects the intentions of the parties because it imposes an absurd obligation. Ordinarily it is presumed that parties read and understand the terms of their contract and that their intentions are manifested in the contract. *J. W. Denio Milling Co. v. Malin*, 25 Wyo. 143, 165 P. 1113, 1115 (1917). As a general rule courts will ascertain the intentions of the parties by interpreting the language that is used in the contract and will not resort to adding what has been omitted or omitting what has been added. *Goodman v. Kelly*, Wyo., 390 P.2d 244, 248 (1964). However, if the plain language of the contract imposes an impossible or absurd condition upon one of the parties the contract will be interpreted so as to effectuate the intentions of the parties at the time of contracting. *Schaffer v. Standard Timber Company*, 79 Wyo. 137, 331 P.2d 611, 614 (1958). In arriving at an interpretation that will give a reasonable meaning to the contract a court may disregard, supply or transpose a phrase in the contract. *McNeil v. Graner*, 91 Cal.App.2d 858, 206 P.2d 38, 42 (1949).

Keeping these general rules in mind, the interest of the parties must be determined. The sole purpose of securing title insurance was to protect the buyers in the event there should develop a flaw in the title. Affidavits of the parties show they contemplated the purchase of only one title policy. I feel it would be an exercise in futility for the sellers to be insured, since they would part with all title upon execution of the conveyance, and the buyers are the ones who need the insurance. Furthermore, title insurance policies are not issued for the purpose of "reflecting" a title; that is the office of an abstract of title. A title policy insures against loss. Although paragraph 8 of the agreement refers to "SELLER," it must be read in conjunction with paragraph 10. This latter paragraph requires that a commitment for insurance be furnished within 15 days after acceptance of the offer indicating the willingness of the insurer "to issue the required Title Insurance Policy upon *completion of sale*." (Emphasis added.) A sale is completed when the deed is executed and delivered. I do not believe that the two paragraphs, read together, can mean anything except that it is the buyers' title that is to be insured.

The only reasonable explanation of why the contract requires that the title insurance policy reflect "merchantable fee title in SELLER" is that there was an error in drafting this paragraph. In order to give effect to the intentions of the parties the phrase "reflecting merchantable fee title in SELLER" must be transposed. I would move the phrase, "reflecting merchantable fee title in SELLER," now appearing at the end of paragraph 8 to the approximate middle of the paragraph so that the paragraph would read:

"Promptly after SELLER'S acceptance of this offer, SELLER shall, at SELLER'S expense, deliver to BUYER or his AGENT or Attorney an Abstract of Title extended to approximate date hereof, *reflecting merchantable fee title in SELLER*, or in lieu thereof to furnish BUYER a Title Insurance Policy in the full amount of the purchase price of the real property in a Title Insurance Company authorized to do business in the State of Wyoming, ~~reflecting merchantable fee title in SELLER~~ . . ." (Emphasis and overstrike indicate transposition.)

### Covenant Survived Delivery of Deed

The present action is neither one to secure specific performance of nor to rescind

an executory contract. The question is, then, what happens to the covenant to deliver abstract or title policy after the deed has been executed and delivered? The majority have concluded that once the deed was executed the provisions of the purchase agreement merged into the deed, and the contract covenant to provide title insurance is no longer operable. I disagree.

The significance of a failure to provide a title insurance policy after the deed has been executed has been before the supreme courts of New Mexico and Idaho. Both states have held that the covenant has not merged with the deed and that the remedy is a suit at law for damages for breach of covenants. In *Chavez v. Gomez*, 77 N.M. 341, 423 P.2d 31, 33 (1967), it is said:

"Generally speaking, provisions in an executory contract to convey are performed when the conveyance is made. Contract provisions as to title, possession, quantities or emblements of the land are, again generally speaking, conclusively presumed to be merged in a subsequently delivered and accepted deed. * * *

"*Where the contract provisions are not performed by delivery and acceptance of the deed, there is no merger.* Such provisions are collateral to and independent of the deed. *Norman v. Turley*, supra [24 N.M. 526, 174 P. 999].

* * * * * *

"The provision for furnishing either abstract of title or title insurance was collateral to and independent of the deed. The doctrine of merger by deed does not apply." (Emphasis added.)

In *Jolley v. Idaho Securities Inc.*, 90 Idaho 373, 414 P.2d 879, reh. denied (1966), the parties had contracted to exchange real properties. One of the provisions in the agreement was that each party would furnish to the other abstract of title as to the property to be conveyed, showing good and marketable title free and clear of all encumbrances except those recited in the agreement. Such an abstract had not been furnished by the corporation to the Jolleys, but the deeds had been executed and delivered. The Jolleys later made substantial

objections to the transaction and attempted to secure a rescission of the whole deal. The Idaho Supreme Court considers the authorities at some length, including its previous decision in *Christiansen v. Intermountain Ass'n of Credit Men*, 46 Idaho 394, 267 P. 1074 (1928). Based upon its analysis of the previous cases, particularly *Christiansen*, the court concluded that

". . . the agreement to furnish the abstract was not merged by the Jolleys accepting the corporation deed and that as a prerequisite to furnishing such abstract, the corporation was required to furnish one showing the 'Title of the transferror to be good and marketable and free and clear of all encumbrances except those set forth herein.'" 414 P.2d at 886.

### Disposition of Appeal

It does not follow, however, that merely because the covenant to furnish a title policy has survived the delivery of the deed the buyers may necessarily claim rescission of that deed. While the distinctions between an executory and executed contract are not always observed, as noted by the majority there is a very real difference. Unless there are other factors present it would seem that the buyers in this case must be left to their action at law for breach of the covenants.

If the factual record had been more developed I might have agreed with the majority that the buyers should be left to an action at law. But no determination has been made as to the authority of the county clerk to refuse to record the deed. If there has been a violation only of the platting and dedication law, § 34–12–101 et seq., W.S. 1977, in that sellers have made too many partial conveyances out of lands owned by them, as prohibited by § 34–12–102, that law permits the county clerk to cause a plat to be made and have the costs thereof assessed against the sellers. Damages would appear to provide a plain and adequate remedy in that case and no basis for the exercise of the equitable powers of the courts is indicated. If the violation is of the

real estate subdivisions act, § 18–5–301 et seq., W.S.1977, the solution may be much more involved. The latter act appears to be much more complicated. Consistently with authority in the statute, the board of commissioners has adopted regulations, but they are not before us. Buyers appear to rely upon the subdivisions act as governing the legality of the conveyance but then rely upon the platting and dedication law as permitting them to recover attorney fees. We are not aware of which law is applicable and the record and briefs do not enlighten us. It may be financially or otherwise impractical to comply with the law and for the buyers to enjoy the benefit of their purchase. Under such circumstances I do not think that we should dispose of this case on some theory of law that may or may not be applicable to the facts as they actually exist.

Many of the authorities which I have considered refer only to fraud as a basis for rescission where the contract has been executed by delivery of the deed. However, in an annotation in 84 A.L.R. 1008, 1010 it is said that the doctrine of merger applies with certain exceptions, one of which is in case of "fraud or mistake." It is said in 27 Am.Jur.2d Equity § 28, p. 552 that

> "It is a broad general principle that a court of equity has jurisdiction to relieve a party to a transaction from the consequences of mistake. * * *
>
> " * * * The fact of mistake being established, the court may, for example, correct that which has been done by virtue of its process, *divest a title which has been acquired*, or interpose to prevent a forfeiture." (Emphasis added.)

It is possible that the situation is analogous to that presented to the Supreme Court of Virginia in *Miller v. Reynolds*, 216 Va. 852, 223 S.E.2d 883, 886 (1976). In that case the parties had contracted for and taken conveyance of a tract of land on the assumption and representation that the land would be suitable for housing construction using a septic tank for sewage disposal. After conveyance it developed that the property could not be so developed because of improper soil conditions. Notwithstanding the delivery of the deed, rescission was ordered in the trial court. In sustaining this decision the supreme court said that an express representation had been made by the sellers that the land was suitable, which was an inducement to buy the property. The court discusses the doctrine of merger but continues:

> "The remedy of rescission is equitable in nature and is a remedy granted or denied within the sound discretion of the trial court. Each case is dealt with in the light of its own circumstances. 'In cases of plain mistake or misapprehension, though not the effect of fraud or contrivance, equity will rescind the conveyance, if the error goes essentially to the substance of the contract, so that the purchaser does not get what he bargained for, or the vendor sells that which he did not design to sell. . . .' 16 M.J., Rescission, Cancellation and Reformation, § 11, p. 138.
>
> "In the instant case the buyers did not get what they bargained for because they could not construct a dwelling on the property. The sellers did not sell what they intended to, for their intention was to convey a lot on which the buyers could get from the proper authorities a permit to construct a building and have it serviced by a septic system. The mistake was a mutual mistake, and a material one, affecting the substance of the contract. The equities of this case clearly require rescission."

Although in the case before us buyers did not plead mistake, contrary to the requirements of Rule 8(c), W.R.C.P., they did argue it before the district court and here. The district court rejected the argument because it appeared that both parties were aware that there might be some county restrictions upon the subdivision and conveyance of the parties. I am concerned that the parties may have in good faith contracted and attempted to consummate that contract upon the basis that there was nothing to prevent the conveyance, and then, without fault on either side, found

**1234**

that they were mistaken. If this was error going "essentially to the substance of the contract," then it seems to me that equitable relief would be proper. In keeping with the provisions of Rule 15, W.R.C.P., that the right of amendment shall be liberally allowed, and in view of the completely unsatisfactory state of the record, buyers should be permitted to amend their complaint in such a way as properly to raise any question concerning any claimed mistake of the parties as to the applicability of the subdivision statutes and the court should then determine whether it is possible to effect the purposes of the parties in entering into this transaction. Sellers would, of course, be entitled to allege and prove any defense pertinent to such equitable proceedings. After trial of the factual issues and a full development of the subdivision question, the district court should be allowed to enter such judgment as is indicated, either for damages or rescission.